UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| FRIENDS OF THE CLEARWATER, | Case No. 3:21-cv-00056-BLW |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| CHERYL F. PROBERT, in her official capacity as Forest Supervisor for the Nez Perce-Clearwater National Forests; UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, | |
| Defendants. | |

## INTRODUCTION

Friends of the Clearwater brought this action challenging the October 2017 Travel Planning Record of Decision for Recommended Wilderness Areas for the Clearwater National Forest. Friends of the Clearwater claims that this 2017 Record of Decision is unlawful and otherwise arbitrary and capricious under (1) the National Forest Management Act; (2) the 2005 Travel Management Rule; and (3) the National Environmental Policy Act. (Dkt. 1.) Before the Court are the parties' cross-motions for summary judgment. (Dkts. 25, 29.) For the reasons discussed below, the Court grants summary judgment in favor of Friends of the

Clearwater on its claims under the National Forest Management Act and the Travel

Management Rule, but grants summary judgment in favor of the Defendants on the

National Environmental Policy Act claims.

## BACKGROUND

The Clearwater National Forest (the Forest) is located in north-central Idaho

between the LoLo and Bitterroot National Forests to the east, the Nez Perce

National Forest to the south, the Idaho Panhandle National Forest to the north, and

the Palouse Prairie to the west. The Forest contains over 1,827,380 acres of

forestlands, and provides habitat for numerous endangered, threatened, and

sensitive wildlife species, species of concern, and management indicator species.

These species include, as relevant to the present case, Rocky Mountain elk, bull

trout, and fisher. (AR 3619.) The Forest also provides diverse recreational

opportunities, including camping, hiking, skiing, biking, fishing, bird and nature

watching, and whitewater boating.

Approximately half of the Forest (950,311 acres) has been designated as

inventoried roadless areas (IRAs), which are 5,000 acre or larger blocks of

primarily roadless lands. The Forest Service has determined that four of the sixteen

IRAs are suitable candidates for prospective Wilderness designation, and these

four areas are currently designated as recommended wilderness areas (RWAs).

One of those four RWAs, Hoodoo RWA, includes the Fish Lake Trail—which is at

issue in this case.

A.    *The Forest Plan*[1]

In 1987, the Forest Service adopted the Forest Plan for the Clearwater National Forest. The Forest Plan identifies a goal to "[m]aintain potential wilderness values on those areas that are being recommended for classified wilderness." (AR 42378.) It recommends some areas, including Management Area B2 (MA B2), for wilderness designation. (AR 42454, 73486, 73498.) Recreation in MA B2 is to be managed to "maintain wilderness qualities and retain semiprimitive settings." (AR 42454.) The Forest Service has interpreted the Forest Plan as requiring that a number of the MAs, including MA B2, maintain 100% Elk Habitat Effectiveness (EHE).[2] (*See e.g.,* AR 73509 (2017 ROD stating, "Forest Plan Standards for Management Area B2 is 100% EHE).)

---

[1] In 2012, the Forest Service began the process of revising the Forest Plan. The Draft Environmental Impact Statement (Draft EIS) for the revised Forest Plan was issued in 2019, and a final Record of Decision is expected sometime in 2022.

[2] The *1997 Interagency Guidelines for Evaluating and Managing Elk Habitats and Populations in Central Idaho* define EHE as "the percentage of available habitat that is potentially usable by elk outside hunting seasons." (AR 36239.) The purpose of these guidelines is to provide "a tool for management of elk populations and habitats on public lands" in Idaho by "setting common forest and species plan objectives and consistent management and evaluation of EHE and EV [elk vulnerability]." (AR 36238.)

**B.** *2005 Travel Management Rule and 2012 Travel Plan Record of Decision*

Prior to 2005, most of the National Forest System lands, including the Clearwater National Forest (CNF or the Forest), were open to motor vehicle use, including travel off from established roads and trails. At the time, if the Forest Service decided to prohibit motor vehicles, it had to take action to close specific roads, trails, or areas and prohibit motor vehicle use thereon. Under this management regime, use-created routes could be established on National Forest System lands, including the CNF, simply by repeated use, and damage to the forest resources could occur. Indeed, unmanaged recreation, and particularly impacts from off-road vehicles, was identified by the Forest Service as one of the key concerns facing the Nation's forests. (AR 3891 ("The primary issue relevant to wildlife associated with implementation of the Travel Planning rule is related to the potential adverse, direct, indirect, and cumulative effects of motorized access on wildlife habitat security. . . . Unmanaged recreation, especially impacts from off-road vehicles, has been identified by the Chief of the Forest Service, as one of the key concerns facing the Nation's forests and grasslands.").)

The 2005 Travel Management Rule, discussed more fully below, sought to eliminate this unrestricted cross-country motor vehicle use by requiring each administrative unit or ranger district to designate roads, trails, and areas that are

open for public motor vehicle use. In 2011, the Forest Service issued a Travel Plan

Final Environmental Impact Statement (2011 FEIS) for the CNF and the CNF

Travel Plan Record of Decision (2012 ROD). Prior to this, motorized and bicycle

travel were allowed within the RWAs. However, the 2012 ROD eliminated most of

the motorized and bicycle travel in RWAs, with some exceptions. One of those

exceptions is at issue in this case—summer motorized and bicycle travel remained

open on 2.7 miles of Fish Lake Trail, which is located in MA B2 in the Hoodoo

RWA.

### C.     *FOC I*

Three lawsuits were filed to challenge the 2011 FEIS and the 2012 ROD.

One of those lawsuits, *Friends of the Clearwater v. U.S. Forest Serv*., No. 3:13-

CV-00515-EJL, 2015 WL 1119593 (D. Idaho Mar. 11, 2015) (*FOC I*), involves the

same parties as the present case and raised numerous claims, some of which are

relevant to the present case.

First, FOC claimed the Forest Service's "actions are inconsistent with the

Forest Plan's establishment of certain management areas requiring 100% [EHE],"

including MA B2. *Id.* at *9. Specifically, FOC claimed that "allowing ORV [off-

road vehicle] use in these areas [including MA B2] is inconsistent with the Forest

Plan's mandates and fails to minimize impacts to wildlife habitat." *Id.* The Court

agreed, finding—over Forest Service objection—that the Forest Service's failure to

comply with the 100% EHE standard equated to non-compliance with the Forest Plan and was thus "arbitrary and capricious." *Id.* at *10-*11.

The second claim in *FOC I* that is relevant to the present case is FOC's claim that the Forest Service failed to comply with the minimizing criteria of the Travel Management Rule (TMR), which implemented Executive Orders 11644 and 11989. Specifically, FOC contended that the Forest Service failed to demonstrate it sought to minimize the impacts to the forest resources and environment. Again, the Court agreed, finding that, to comply with the TMR, the Forest Service "must show that when developing the Travel Plan it considered the minimizing criteria and also that it applied those minimizing criteria with the objective of minimizing the impacts on the natural environment." *Id.* at *15. The Court found that the Forest Service had properly considered the minimization criteria but had failed to show how it applied that criteria to the route designation choices, including in relation to elk habitat. *Id.* at *16-*17.

The third claim in *FOC I* that is relevant to the present case is FOC's claim that the Forest Plan required the Forest Service to manage RWAs, including MA B2, to protect the wilderness character and, further, that this requirement necessarily prohibited motorized use because motorized use is inconsistent with management to protect wilderness character. The Court rejected this claim, finding

that the Forest Plan did not expressly prohibit motorized use in RWAs, and, as to MA B2, that there had historically been some recreational motorized use there. *Id.* at *12. The Court further found that the Forest Service had provided a reasoned explanation for its decision to allow some motorized use in the RWAs, including MA B2. Accordingly, the Court found that the Forest Service did not act arbitrarily and capriciously in deciding to allow some managed motorized access in the RWAs.

In sum, *FOC I* found the Forest Service acted arbitrarily and capriciously by (1) failing to comply with the 100% EHE standard, including in MA B2, and (2) failing to show how it applied the minimization criteria to the route designation choices, including in relation to elk habitat. The Court therefore remanded the Travel Plan, 2011 FEIS, and 2012 ROD to the Forest Service for reconsideration and further evaluation. *Id.* at *18.

### D.   *2017 Record of Decision*

Following the remand in *FOC I*, the Forest Service issued a revised ROD in 2017. The Forest Service based the 2017 ROD on the analysis contained in the 2011 FEIS. The 2017 ROD explained: "[N]o significant new information regarding the effects of travel management in RWAs has come to my attention or been developed since publication of the [2011] FEIS which discloses potentially significant environmental impacts of the alternatives considered." (AR 73484.) The

Forest Service thus determined that no supplement to the 2011 FEIS was required.

The 2017 ROD continues to prohibit motorized and mechanized travel in RWAs but allows summer motorized and mechanized travel on Fish Lake Trail. The Forest Service concluded motorized and mechanized use should be prohibited in each of the RWAs because, "[c]ontinuing to allow unregulated motorized recreation in RWAs would negatively impact naturalness, primitive character, opportunities for solitude, and wolverine." (AR 73493.) However, the Forest Service concluded that the summer motorized and mechanized use of Fish Lake Trail should be permitted to continue for numerous reasons, including (1) the trail is established on a former dozer road that was well established in 1987, when the Forest Plan was finalized; (2) the trail is carefully constructed with resource protection facilities in place; (3) over 110,000 acres of the Hoodoo RWA, in which Fish Lake Trail is located, are unaffected by the motorized and mechanized use of Fish Lake Trail; (4) Fish Lake Trail provides access to Fish Lake for many people who otherwise could not access it; (5) although the Forest Plan RWA includes Fish Lake Trail, the proposed Wilderness legislation does not; and (6) snowmobile use on Fish Lake Trail is prohibited. (AR 73499-500.) The Forest Service concluded: "continued summer motorized and mechanized use of the Fish Lake Trail is a compromise that will allow some well-regulated motorized and mechanized

recreational uses to continue, while moving other areas within the RWAs closer to the goals established in the Forest Plan." (AR 73500.)

The 2017 ROD also explained how this decision complied with the 2005 Travel Rule and minimization criteria in the Executive Orders. Specifically, the 2017 ROD states that closing RWAs to motorized use (with the exception of Fish Lake Trail) eliminates damage to forest resources and potential conflicts in 99.5% of the RWA acreage; and, as to Fish Lake Trail, the decision minimizes potential impact by ensuring the trail meets all best management practices to reduce impacts from motorized use. (AR 73496-97, 73502-10.)

### E.   *2020 U.S. Fish & Wildlife Update to Grizzly Bear Map*

In December 2020, the U.S. Fish & Wildlife Service (USFWS) updated their map of the area where grizzly bears may be present to include parts of the Forest. (AR 73559.) This map does not, however, indicate that grizzly bears may be present near the Fish Lake Trail. (AR 73569.)

In response to this updated information regarding grizzly bears, the Forest Service considered whether the 2011 FEIS should be supplemented. (AR 73567.) The Forest Service concluded that the updated information did not reveal effects on grizzly bears that had not been previously considered because the project area is not occupied by a breeding population of grizzly bears. Thus, the Forest Service determined that supplementation of the 2011 FEIS was not required. (AR 73567.)

## LEGAL STANDARDS

### A.    *Summary Judgment Standard*

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Karuk Tribe of Cal. v. U.S. Forest Serv*., 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc). Because this is an administrative record review case, the Court may grant summary judgment to either party based upon a review of the administrative record. *Id.*

### B.    *Administrative Procedures Act*

Judicial review of agency actions under the National Forest Management Act (NFMA), the Travel Management Rule (TMR), and the National Environmental Policy Act (NEPA) is governed by the Administrative Procedures Act (APA). Under the APA, a court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see WildEarth Guardians v. Montana Snowmobile Ass'n*, 790 F.3d 932 (9th Cir. 2015) (reviewing travel management rule claim under the APA); *Neighbors of Cuddy Mtn. v. Alexander*, 303 F.3d 1059, 1065 (9th Cir. 2002) (reviewing NFMA and NEPA claims under the APA); *see also Native Ecosystems Council v. U.S. Forest Serv*., 428 F.3d 1233, 1238 (9th Cir. 2005) ("Because NFMA and NEPA do not provide a private cause of action to enforce their provisions, agency decisions

allegedly violating NFMA and NEPA are reviewed under the [APA].").

Under the APA, a reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). The reviewing court's inquiry must be "thorough," but "the standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency." *Id*.; *see Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv*., 524 F.3d 917, 927 (9th Cir. 2008) (Although a court's review is deferential, the court "must engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it."). To withstand review under the APA, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

## NATIONAL FOREST MANAGEMENT ACT CLAIM

### A.    *NFMA Statutory Framework*

NFMA and its implementing regulations "provide for forest planning and management by the Forest Service on two levels: (1) forest level and (2) individual project level." *Native Ecosys. Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir.

2012). "On the forest level, the Forest Service develops a Land and Resource Management Plan (forest plan), which consists of broad, long-term plans and objectives for the entire forest." *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1109-10 (9th Cir. 2018) (citations and quotation marks omitted). "The forest plan is then implemented at the project level." *Id.*

"Site-specific projects and activities must be consistent with an approved forest plan." *Id.*(citing 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(e)). *See also Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005) ("It is well-settled that the Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA."); *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 962 (9th Cir. 2002) ("[A]ll management activities undertaken by the Forest Service must comply with the forest plan, which in turn must comply with the Forest Act...."). "A project is consistent if it conforms to the applicable 'components' of the forest plan, including the standards, guidelines, and desired conditions that are set forth in the forest plan and that collectively establish the details of forest management." *All. for the Wild Rockies*, 907 F.3d at 1109-10.

### B.     *The 2017 ROD violates the Forest Plan*

FOC argues that the Forest Service's 2017 travel management decision—the 2017 ROD—violates the Forest Plan and is thus arbitrary and capricious. Specifically, FOC argues that the Forest Plan requires all MAs, including MA B2,

to comply with the 100% EHE standard; that the Fish Lake elk analysis area (EAA) is at only 90% EHE; that motorized vehicles have a negative impact on elk; and that, despite the Fish Lake EHE being at only 90%, the 2017 ROD continues to allow motorized use of Fish Lake Trail, located in MA B2 and the Fish Lake EAA.

The Forest Service does not dispute the negative impact of motorized activities on elk, nor does the Forest Service dispute that the 2017 ROD fails to comply with the 100% EHE standard. Instead, the Forest Service argues (1) that it is not bound by the 100% EHE standard, and (2) that the 2017 ROD increases elk habitat *security* in the CNF and thus complies with the Forest Plan. The Court disagrees as to both of these arguments.

### 1.  The Forest Service is bound by the 100% EHE standard

The Forest Service's position that it is not bound by the 100% EHE standard is barred under the doctrine of collateral estoppel.

Collateral estoppel, or issue preclusion, bars a party from relitigating an issue of fact or law that was determined by a prior adjudication. *Resolution Trust Corp. v. Keating*, 786 F.3d at 1110, 1114 (9th Cir. 1999). The doctrine applies when: (1) the issue in the prior case and the present case is the same; (2) the issue was actually litigated and determined in the prior case by a valid and final judgment; and (3) the determination of the issue was essential to that judgment. *Amadeo v. Principal Mut. Life Ins. Co*., 290 F.3d 1152, 1159 (9th Cir. 2002).

Further, the party against whom collateral estoppel is asserted, i.e., the party allegedly precluded from relitigating an issue, must have had "a full and fair opportunity to litigate that issue." *Id.* (internal quotation marks omitted).

Applying these elements to the present case, the Court finds that collateral estoppel precludes the Forest Service's argument that it is not bound by the 100% EHE standard. First, the issue in the prior case—*FOC I*—and the present case is the same: whether the Forest Service is bound by the 100% EHE standard under the Forest Plan.

Second, that issue was actually litigated and determined in the prior case by a valid and final judgment. In *FOC I,* the Court found that the Forest Service was bound by the 100% EHE standard and that its failure to comply with that standard equated to non-compliance with the Forest Plan. Thus, the Court granted summary judgment on the EHE issue in favor of FOC and against the Forest Service. *See FOC I*, 2015 WL 119593, at *10-*11 Indeed, the Forest Service admits as much. (*See* Dkt. 38 at 3 ("It is true that Judge Lodge ruled in 2015, over the Forest Service's objection, that non-compliance with the [100% EHE] standard equated to non-compliance with the" Forest Plan.).

Third, the determination of the 100% EHE issue was essential to the grant of summary judgment in favor of FOC on the claim that the Forest Service's actions

were inconsistent with the Forest Plan's establishment of certain MAs requiring 100% EHE. *See id.* Finally, the Forest Service had a full and fair opportunity to litigate the issue. Again, the Forest Service admits as much when it states that the Court's ruling on this issue was over the Forest Service's objection.

The Court therefore finds the Forest Service to be collaterally estopped from relitigating the question of whether it is bound by the 100% EHE standard under the Forest Plan.[3] There is, accordingly, no need to address the multiple new arguments the Forest Service raises in support of its position that it is not bound by the 100% EHE standard.

### 2.  The 2017 ROD does not comply with the Forest Plan.

The 2017 ROD calculated the 90% EHE in the Fish Lake elk assessment area due to a variety of factors, including habitat conditions. (AR 73552, 73555.) The 2017 ROD also states that continued summer motorized and mechanized use of Fish Lake Trail would not diminish EHE from that 90% level, but that

---

[3] Moreover, the Court notes that the Forest Service has repeatedly and long recognized the binding nature of the 100% EHE standard for RWAs in the CNF (*see, e.g.,* AR 42918, 45598, 45699, 73219, 73509.) Further, the Forest Service recognized the 100% EHE standard in the 2017 ROD itself. Thus, the Forest Service's argument that it is not bound by the 100% EHE standard under the Forest Plan is an attempt to make a *post hoc* rationalization for its decision to allow continued motorized use of the Fish Creek Trail. "This line of reasoning contradicts the foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. E.P.A.*, 576 U.S. 743, 758 (2015). The Court accordingly rejects the Forest Service's argument on this additional ground.

eliminating motorized use of Fish Lake Trail would increase EHE to 95%. (*Id.*)

Thus, according to the 2017 ROD, allowing continued motorized and mechanized use of Fish Lake Trail would not result in the EHE degrading below its current 90%, but stopping motorized use would result in EHE increasing to 95%. In other words, the 2017 ROD demonstrates that allowing continued motorized use of Fish Lake Trail is preventing the EHE from improving beyond the current 90% level.[4]

The Forest Service argues, nonetheless, that it did not make a clear error in judgment in determining the 2017 ROD complies with the Forest Plan because "the 2017 ROD 'will probably result in a non-measurable *improvement* in elk habitat security across the Forest.' " (Dkt. 29-1 at 28 (emphasis in original) (quoting (AR 73508).) This argument fails for a couple of reasons. First, the argument ignores the 100% EHE standard required by the Forest Plan, and the Forest Service's obligation to strictly comply with that standard in RWAs, including in MA B2. Second, the fact that forest-wide there may be a non-measurable increase in elk *security* does not demonstrate an improvement—or lack

---

[4] The conclusion that motorized vehicles negatively impact EHE, and the inverse that removing motorized vehicles is likely to positively impact/increase EHE, finds support throughout the record.

of negative impact—on elk habitat *effectiveness* in MA B2.[5] Third, Forest Service,
again, ignores the fact that the record demonstrates that allowing continued
motorized use of Fish Lake Trail means that the Fish Lake EAA will remain at
90% EHE rather than improving to 95% if motorized use is eliminated.

In sum, the Forest Plan imposes a 100% EHE standard for the RWAs in the
CNF, including MA B2 and the Fish Lake EAA contained therein. The Forest
Service must strictly comply with that standard. *See All. for the Wild Rockies,* 907
F.3d at 1110. The Forest Service's decision to allow continued motorized vehicle
use of Fish Lake Trail—which at minimum keeps EHE at 90% and prevents EHE
from improving to 95%—equates to non-compliance with the Forest Plan. The
decision to allow continued motorized use is accordingly arbitrary and capricious.

### 3.  The 2021 report cannot retroactively justify the 2017 decision.

Finally, the Forest Service seeks to justify its 2017 decision to allow
continued motorized use of Fish Lake Trail by citing to a report the Forest Service
issued in 2021, after this case was filed. The Forest Service explains that the 2021
report was prepared to respond to the Court's decision in *FOC I.*

---

[5] As noted previously, the Forest Service is precluded from challenging the 100% EHE
standard. Thus, its reference to potential improvement in elk habitat *security*, rather than to the
impact on elk habitat *effectiveness*, is inapposite.

Relevant to EHE, the 2021 report finds that the 2017 analysis of the Fish Lake EAA contained a miscalculation. Specifically, according to the 2021 report, the EHE in the Fish Lake EAA is actually 95% (rather than 90%), and even if motorized travel was eliminated on Fish Lake Trail, the EHE would remain at 95%. (AR 74618, 74619.) The Forest Service argues that the 2017 ROD, with the corrected calculation, thus complies with the Forest Plan because the retention of motorized used of Fish Lake Trail maintains the current EHE and does not diminish it.

It is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. E.P.A.*, 576 U.S.743, 758 (2015). Thus, the Forest Service cannot rely on its 2021 report to retroactively justify its 2017 decision to allow continued motorized use of Fish Lake Trail.[6]

### TRAVEL MANAGEMENT RULE CLAIM

FOC argues that, in approving the 2017 ROD, the Forest Service failed to comply with the "minimization criteria" set out in the Travel Management Rule

---

[6] The Court also notes that there is no indication that the 2021 report has been subjected to the public notice and comment process required under the APA. Thus, the 2021 report does not appear to be a "decision" of the Forest Service.

and Executive Order 11644. The Court agrees.

**A.**     *Travel Management Rule Statutory Framework*

Executive Orders 11644 and 11989 require federal agencies, including the

Forest Service, to develop regulations limiting off-road vehicle use on public lands

to "protect the resources of those lands, to promote the safety of all users of those

lands, and to minimize conflicts among the various uses of those lands." EO

11644. The Travel Management Rule, which implements Executive Orders 11644

and 11989, imposes certain criteria that the Forest Service must use in designating

roads, trails, and areas on Forest Service lands, including national forests. *See* 36

C.F.R. §§ 212.50, 212.51; *Idaho Conserv. League v. Guzman*, 766 F. Supp. 2d

1056, 1061 (D. Idaho 2011) (each national forest must comply with the Travel

Management Rule by specifying "designated routes, vehicle types, and seasons of

use for motorized travel on national forest roads, trails, and other areas").

Motorized use off of the designated roads and trails, and outside of designated

areas, is prohibited. 36 C.F.R. § 212.50.

In designating roads, trails, and other areas open to motor vehicle use in

national forests, the Forest Service is to consider, among other things, the effects

on "National Forest System natural and cultural resources, public safety, provision

of recreational opportunities, access needs, conflicts among uses of National Forest

System lands . . . ." 36 C.F.R. § 212.55(a). In addition, in designating trails and

areas in national forests, the Forest Service must consider the effects on, and seek to minimize, the following "minimization criteria":

 (1) Damage to soil, watershed, vegetation, and other forest resources;

 (2) Harassment of wildlife and significant disruption of wildlife habitats;

 (3) Conflicts between motor vehicle use and existing or proposed recreational uses of National Forest System lands or neighboring Federal lands; and

 (4) Conflicts among different classes of motor vehicle uses of National Forest System lands or neighboring Federal lands.

In addition, the responsible official shall consider:

 (5) Compatibility of motor vehicle use with existing conditions in populated areas, taking into account sound, emissions, and other factors.

36 C.F.R. § 212.55(b). The Forest Service is required to comply with this minimization criteria "in a manner that is feasible, prudent, and reasonable in light of the agency's multiple-use mandate." *WildEarth Guardians v. Montana Snowmobile Ass'n*, 790 F.3d 920, 930 (9th Cir. 2015).

 To demonstrate compliance with the minimization criteria, the Forest Service must show that it "(1) considered ORV impacts in terms of the minimization criteria and (2) made efforts to minimize these impacts given the fact that ORV use is a permissible recreational use on the national forests and ORV

use, like any other human activity on the forest, will have some impact on the natural environment." *Idaho Conserv. League*, 766 F. Supp. at 1072. A travel management plan violates the Travel Management Rule if there is no "evidence reflecting how the Forest Service applied the minimization criteria." *Id.* at 1074. Further, the Travel Management Rule does not allow "the Forest Service to designate multiple areas for motorized use on the basis of a single forest-wide analysis and general decisionmaking principles." *WildEarth Guardians*, 790 F.3d at 930. Instead, the Forest Service must "apply the minimization criteria to each area it designated." *Id.*

### B. *FOC I*

In *FOC I*, this Court held that the Forest Service violated the Travel Management Rule because the 2011 FEIS and 2012 ROD "failed to show that the Travel Plan selected routes 'with the objective of minimizing.' " 2015 WL 119593, at *17.

> The narrative discussions concerning the risks and impacts of the project alternatives on the listed criteria do not show how the Forest Service applied the minimizing criteria to the route designation choices. This is particularly true in regards to the elk habitat discussion where the Forest Service selected routes that were more damaging to critical elk habitat in the highest quality elk habitat in the forest. The Court finds the record does not show how the Forest Service applied the minimizing criteria.

*Id.* (footnoted omitted).

The Court specifically found that the record did not include a "route-by-route discussion," and that such a discussion may not be necessary. However, the Court found the record to be inadequate because it failed to "show that the Forest Service acted with the objective of minimizing in this case." *Id.* The Court concluded that, "It may very well be that the chosen routes were in fact selected with the minimizing criteria in mind. It is just not evident from this record that is the case." *Id.* The Court therefore remanded the Travel Plan, 2011 FEIS, and the 2017 ROD for reconsideration and further evaluation.

### C.   Analysis of the 2017 ROD for compliance with the Travel Management Rule[7]

FOC contends that the 2017 ROD fails to comply with the Travel Management Rule because it (1) does not provide the required route-level, granular analysis of the application of the minimizing criteria required when making motorized use designations in RWAs; and (2) does not discuss how the location of motorized routes minimize impacts on forest resources, such as riparian vegetation

---

[7] As noted previously, in preparing the 2017 ROD, the Forest Service did not prepare an updated EIS and instead relied on the 2011 FEIS. The 2011 FEIS was found to be inadequate to comply with the Travel Management Rule. *See FOC I*, 2015 WL 119593, at *17. Thus, the Court focuses on the 2017 ROD in determining whether the Forest Service has complied with the Travel Management Rule.

or wildlife such as elk, grizzly bears, bull trout, and fisher; and minimize conflicts between different individuals recreating in RWAs.

### 1. The Forest Service is required to, but did not provide a route-level analysis

In *FOC I*, the Court indicated that the Forest Service was "not necessarily required to conduct a route by route specific analysis as to how it has applied the minimizing criteria in every case in order to satisfy" the requirements of the Travel Management Rule. *See FOC I*, 2015 WL 119593, at *15; *see also id.* at *17 (reiterating that the Court did not "find that a route-by-route discussion is necessary"). However, subsequent to *FOC I*, the Ninth Circuit clarified that "the TMR requires the Forest Service to apply the minimization criteria to *each area* it designated for snowmobile use." *WildEarth Guardians*, 790 F.3d at 930 (emphasis in original). Thus, analysis at the route level is required under the TMR. Further, to comply with the TMR, the Forest Service must "document how it evaluated and applied the data on an area-by-area basis with the objective of minimizing impacts as specified in the TMR." *Id.* at 931.

Here, the 2017 ROD closed all motorized use in RWAs *except* summer motorized use of Fish Lake Trail. (*See* AR 73489.) Thus, the Forest Service was required to apply the minimizing criteria only in relation to the Fish Lake Trail.

The Forest Service contends it complied with the requirements of the TMR

by providing a "detailed analysis of potential effects" on the Fish Lake Trail.

However, a review of the 2017 ROD reveals that, to the contrary, the Forest

Service did not document how it evaluated and applied the data with the objective

of minimizing impacts at the route level, i.e., specific to Fish Lake Trail.

> **2. The 2017 ROD does not document how the Forest Service evaluated and applied the data, with the objective of minimizing the impacts, in relation to the motorized use of Fish Lake Trail**

>> *a. Effects on Soil, Watershed, Vegetation, and Other Forest Resources*

The Forest Service contends that it considered, with the objective of

minimizing, the effects on soil, watershed, vegetation, and other forest resources,

and thus complied with the requirements of the TMR. The Court disagrees.

The 2017 ROD provides as follows regarding the minimization criteria

regarding the effects on soil, watershed, vegetation and other forest resources:

> Fish Lake Trail (Trail 419) is a two-mile "road" within the Hoodoo RWA. It began as a dozer road, constructed during the 1970's to access a fire, replacing a trail which had been established in earlier years. After the fire, full-size vehicles were able to use the dozer road to access Fish Lake for several years. The trail was later closed to full-size vehicle traffic, and is currently managed as a motorized trail open to ATV's, motorcycles, and bicycles, as well as non-motorized uses such as horses and hikers. A recent lawsuit concluded that resource protection structures and traffic control devices on Fish Lake Trail (Trail 419) protect wilderness character, even though they have some negative effect on wilderness character attributes (FEIS pages 132-133).

The TMR requires the Forest Service to comply with the minimization

criteria while meeting the agency's multiple-use mandate (page ROD-18). I find that there are minimum resource tradeoffs with Alternative C modified, and they are acceptable to retain the popular summer recreation use of Fish Lake Trail (Trail 419).

(AR 73507.)

This general reference in the 2017 ROD to the minimization criteria, and reference to "resource protection structures, and traffic control devices" on Fish Lake Trail as impacting the "wilderness character," is insufficient. What is needed, and is lacking, is a discussion or documentation of how the Forest Service evaluated and applied the data, with the objective of minimizing the impacts, in relation to the motorized use of Fish Lake Trail. *See WildEarth*, 790 F.3d at 930-31 (to comply with the TMR, the Forest Service must "document how it evaluated and applied the data on an area-by-area basis with the objective of minimizing impacts as specified in the TMR").[8]

b. *Effects on Wildlife and their Habitat*

---

[8] The other portions of the AR cited by the Forest Service do not cure this deficiency. For example, the Forest Service cites to a response to a comment, which states, in relevant part, that Fish Lake Trail "includes resource protection structures and traffic control devices to minimize effects of off-road vehicles," but provides no further explanation. (AR 73218.) The Forest Service cites to portions of the record that reference resource protection facilities installed at the Fish Lake area to limit motorized use to the access trail and campsite parking areas in relation to the protection of the wilderness character of the RWA. (See AR 2643; AR 73499.) The cited portions of the AR simply do not demonstrate that the Forest Service evaluated and applied the data, with the objective of minimizing, the impacts relating to the motorized use of the trail.

The Forest Service contends that it complied with the requirements of the TMR because it considered, with the objective of minimizing, effects on wildlife and their habitat of allowing motorized use of Fish Lake Trail. Again, the Court disagrees.

The 2017 ROD provides as follows regarding the minimization criteria and the effects on wildlife and their habitat:

> My decision will probably result in a non-measurable improvement in elk habitat security across the Forest because cross-country travel is currently limited by dense vegetation and steep topography; however, some critical habitat features such as salt licks, meadows, and openings would benefit from restricting cross-country travel (FEIS page 338). Alternative C Modified would increase acres of elk habitat security in MA B2 from a total of 158,563 acres to a total of 178,049 acres (FEIS page 336).

> During the objection process, some objectors recommended closing Fish Lake Trail (Trail 419) to motorized and mechanized uses to protect wildlife habitat in RWAs. To adopt this recommendation within the framework of the agency's multiple use mandate, I would need to expect that restricting motorized and mechanized use on Fish Lake Trail (Trail 419) would contribute meaningfully to sustaining healthy wildlife populations. However, the FEIS and subsequent analysis does not indicate that this closure is needed to protect wildlife resources.

> The Forest conducted a clarifying analysis in June 2017, specific to Fish Lake Trail (Trail 419) which found that the only motorized use in MA B2 would be Fish Lake Trail (Trail 419), which is important to the recreational users of the area. Elk habitat analyses show that the motorized use of Fish Lake Trail (Trail 419) would have no effect on current Elk Habitat Effectiveness (EHE) as the motorized trail is part of the existing landscape and is not the cause of EHE being lower than

Forest Plan Standards in the Fish Lake Elk Analysis Area (EAA).

Forest Plan Standards for Management Area B2 is 100% EHE. The selected alternative would not diminish current EHE. Dropping the motorized use of Fish Lake Trail (Trail 419) would not raise EHE to 100% because EHE within the Fish Lake EAA is ultimately limited to below 100% (Forest Plan Standards) as a result of habitat conditions (i.e. the existing juxtaposition and size of foraging areas). Because habitat conditions prevent EHE from ever reaching 100%, the analysis states that activities within the Fish Lake EAA should maintain and not diminish EHE. Retention of motorized use of the 419 Trail maintains current EHE.

The objectors' recommendations are not consistent with the balance of multiple uses that the Forest Plan directs us to provide. Based on the 2011 FEIS analysis for wildlife resources and the recent clarifying analysis, closing RWAs to motorized and mechanized uses with the exception of Fish Lake Trail (Trail 419) will comply with the minimization criteria by protecting wildlife resources in a manner that is feasible, prudent, and reasonable in light of the agency's multiple use mandate.

(AR 73508-09.)

The 2017 ROD appears to adequately document how it evaluated and applied the data, with the objective of minimizing the impact of motorized use of Fish Lake Trail in relation to the elk and elk habitat. However, there is no documentation regarding the evaluation and application of data, with the objective of minimizing the impact on other wildlife.

In its reply brief, the Forest Service cites to additional portions of the 2017 ROD in an effort to demonstrate compliance with the TMR in relation to such

other wildlife. (*See* Dkt. 38 at 7.) This effort is unavailing as none of the citations provided demonstrate compliance with the minimization criteria.

For example, at AR 73484-85, the Forest Service describes the TMR, the relevant executive orders, and the need to minimize conflicts. However, there is no discussion regarding Fish Lake Trail.

At AR 73490-91, the Forest Service describes the ESA-listed species and notes minimization of impacts to forest resources is a key criteria, but does not reference Fish Lake Trail, the impacts of motorized use of that trail, or the evaluation and application of data, with the objective of minimizing, those impacts.

At AR 73496-97, the Forest Service considers the minimization criteria, and states in relation to Fish Lake Trail, that the Forest Service considered the TMR criteria and the 2017 ROD meets the objective of minimizing the effects by, "in the case of Fish Lake Trail (Trail 419), ensuring that the trail meets all best management practices to reduce impacts from motorized use." (AR 73496-97.) This portion of the 2017 ROD in turn refers to "ROD-16," (AR 73499), which states the following in relation to the Fish Lake Trail: that the trail was established on a former dozer road; that motorized use of the trail was well-established in 1987; that a group of volunteers worked extensively shortly after 1987 to convert the former dozer road into an ATV trail "that provides short and gentle access to

Fish Lake"; that these volunteers "worked carefully to install resource protection facilities to limit motorized use to the access trail and campsite-specific parking areas"; and that the resource protection measures are currently enforced under a Forest Supervisor Order. (AR 73499.) While the reference to "resource protection facilities" on the trail indicates that there are some resource protections in place, this reference does not demonstrate that the Forest Service has evaluated and applied data, with the objective of minimizing, the impacts of the motorized use of the trail. For example, there is no discussion of whether there are additional measures that could feasibly be taken to minimize the impacts.

Finally, at AR 73500, the Forest Service states that it is restricting winter use of the trail in its entirety and provides an explanation and evaluation of the reason for that closure, including the impacts that winter use would have on the area. The Forest Service also explains that allowing the continued summer motorized use of the Fish Lake Trail "is a compromise that will allow some well-regulated motorized and mechanized recreational uses to continue, while moving other areas within RWAs closer to the goals established in the Forest Plan." Again, this does not demonstrate an analysis and application of data, with the objective of minimizing the continued *summer* motorized use of the Fish Lake Trail.

In making its decision to allow continued summer motorized use of Fish

Lake Trail, the Forest Service may well have taken actions that seek to minimize the impacts of that use. However, the citations to the record provided by the Forest Service fail to provide the needed documentation of how it evaluated and applied the data regarding the motorized use of Fish Lake Trail, with the objective of minimizing impacts, as required under the TMR. Accordingly, the decision to allow continued motorized use of Fish Lake Trail is not in compliance with the TMR. *See WildEarth Guardians*, 790 F.3d at 932.

## NATIONAL ENVIRONMENTAL POLICY ACT CLAIM

### A.    *NEPA Statutory Framework*

"NEPA imposes procedural requirements, but not substantive outcomes, on agency action." *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005) (citing *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989). Under NEPA "federal agencies, including the Forest Service, [must] assess the environmental impact of proposed actions that 'significantly affect[ ] the quality of the human environment.' " *WildEarth Guardians v. Provencio*, 923 F.3d 655, 668 (9th Cir. 2019) (quoting 42 U.S.C. § 4332(C)).

NEPA "serves two fundamental objectives. First, it ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Id.* (citation and internal quotation marks omitted). "[S]econd, it requires that the relevant

information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision." *Id.* (citation and internal quotation marks omitted). "In short, NEPA's purpose is to ensure that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Id.* (citations and internal quotation marks omitted).

"[T]o accomplish this, NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at environmental consequences." *Powell*, 395 F.3d at 1027 (citation omitted). Further, courts are to "strictly interpret the procedural requirements in NEPA to the fullest extent possible consistent with the policies embodied in NEPA. [G]rudging, pro forma compliance will not do." *WildEarth Guardians*, 923 F.3d at 668 (citations, ellipses, and quotation marks omitted). Finally, "agencies must ensure 'that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA.' " *Id.* (quoting 40 C.F.R. § 1500.1(b)).

NEPA also imposes a continuing obligation to supplement its environmental analysis "if a major Federal action remains to occur, and . . . [t]here are significant

new circumstances or information relevant to environmental concerns and bearing
on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(ii). Thus, "an
agency that has prepared an EIS cannot simply rest on the original document. The
agency must be alert to new information that may alter the results of its original
environmental analysis, and continue to take a 'hard look at the environmental
effects of [its] planned action, even after a proposal has received initial approval.' "
*Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557-58 (9th Cir. 2000)
(quoting *Marsh*, 490 U.S. at 374) (internal quotation marks omitted) (alteration in
original). When faced with new information, the agency must "make a reasoned
decision based on the significance—or lack of significance—of the new
information and prepare a supplemental EIS when there are significant new
circumstances or information relevant to environmental concerns and bearing on
the proposed action or its impacts." *Dombeck*, 222 F.3d at 557 (quoting *Marsh*,
490 U.S. at 378; 40 C.F.R. § 1502.9(c)(1)(ii)) (alterations, ellipses and internal
quotation marks omitted). " 'If there remains major Federal action to occur, and the
new information is sufficient to show that the remaining action will affect the
quality of the human environment in a significant manner or to a significant extent
not already considered, a supplemental EIS must be prepared.' " *Id.* at 557-58
(quoting *Marsh*, 490 U.S. at 374).

### B.    *Analysis of NEPA Claims*

FOC contends that the Forest Service violated NEPA in its evaluation of the

environmental impacts of motorized recreation on RWAs—which, as discussed

earlier, is limited to Fish Lake Trail—by failing to take a "hard look" at the

impacts of such use on grizzly bears, bull trout, and fisher as well as their habitats.

The Forest Service contends that FOC's NEPA claim is barred under the doctrines

of claim or issue preclusion. The Forest Service further contends that even if  the

NEPA claims are not barred, the claims fail because the Forest Service complied

with the "hard look" requirement.

### 1.  FOC's NEPA challenges to the 2017 ROD are not barred by issue or claim preclusion

The Forest Service argues that FOC's NEPA claims are barred because FOC

brought this same claim in *FOC I* and judgment was entered against FOC on that

claim.

"The preclusive effect of a judgment is defined by claim preclusion and

issue preclusion, which are collectively referred to as 'res judicata.' " *Taylor v.

Sturgell*, 553 U.S. 880, 892 (2008). "Under the doctrine of claim preclusion, a final

judgment forecloses 'successive litigation of the very same claim, whether or not

relitigation of the claim raises the same issues as the earlier suit.' " *Id.* (citation

omitted). "Issue preclusion, in contrast, bars 'successive litigation of an issue of

fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Id.* (citation omitted). "By precluding parties from contesting matters that they have had a full and fair opportunity to litigate, these two doctrines protect against the expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibility of inconsistent decisions." *Id.* (citations, alterations, and internal quotation marks omitted).

FOC brought a claim in *FOC I* that the 2011 EIS violated NEPA's "hard look" requirement, including in relation to the designation of motorized trails and that claim was dismissed on summary judgment. *See FOC I,* 2015 WL 1119593, at *n.1, *6, *7. In the present case, FOC contends that it is not challenging the validity of the 2011 FEIS but is instead challenging the 2017 ROD and the Forest Service's use of the 2011 FEIS to support the 2017 ROD. FOC also points out that it could not have brought this challenge to the 2017 ROD in the previous litigation, which was filed in 2013. Further, the challenges brought by FOC in the previous litigation did not include a NEPA challenge regarding the failure to take a "hard look" at the impacts of motorized use on grizzly bears, bull trout, the fisher, or their habitats.

The Court agrees. The Court finds, to the extent FOC is challenging the

2017 ROD as failing to take the required "hard look" at the impacts to grizzly bears, bull trout, and fisher and their habitat, such a claim is not barred.

## 2. The Forest Service complied with NEPA in issuing the 2017 ROD

FOC contends that the Forest Service violated NEPA by failing to take a "hard look" at the direct, indirect, and cumulative impacts of motorized used of Fish Lake Trail on grizzly bear, bull trout, and fisher, and their habitats. The Court disagrees and finds that the Forest Service complied with NEPA.

### a. Grizzly bear

As to grizzly bears, FOC contends that the Forest Service did not analyze the impacts of the motorized use on grizzly bears despite the observation of grizzly bears on the Forest. The Forest Service explained, however, that the USFWS did "not consider any portion of the project area to be occupied by a breeding population of grizzly bears." (AR 2799.) The Forest Service also notes that there is not any area of the Forest that is designated as critical habitat for grizzly bears.

The Court agrees that the Forest Service was not required to take a "hard look" at the impacts on grizzly bears. There was no evidence of resident grizzly bears in the Forest, no evidence of a breeding population of grizzly bears, and no evidence of grizzly bear occupation on the Forest. Further, there was no evidence of grizzly bear presence or occupation near the Fish Lake Trail—which is the

project area at issue. Under these circumstances, the 2017 ROD and 2011 FEIS's brief discussion was sufficient to comply with NEPA.

FOC points out that there was a determination that grizzly bears "may be present" in the Forest. However, this potential presence was not in the Fish Lake Trail area. It is also important to note that the summer motorized use of Fish Lake Trail was not a new use but instead a use that has been in place since before the designation of the Clearwater National Forest.

Finally, FOC's reliance on *WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208 (D. Or. 2019) is misplaced. In that case, the administrative record showed that although there were no breeding packs of gray wolves in the project area, and no consistent occupation of the project area by gray wolves, there were numerous references to the wolves' presence, and a marked increase in use of the area, and expanding distribution and movement of the wolves through the area. The record also showed that the wolf was "likely to occupy" the project area. *Id.* at 1230-31. Further, the record showed the potential negative impacts on the wolves' use of the project area from, among other things, increased traffic. *Id.* at 1231. Under those circumstances, the court found that the Forest Service was required to take a "hard look" at the project's effects on gray wolves if the gray wolves "may be present" in the project area. *Id.* at 1231-32.

In contrast to the situation in *WildEarth Guardians v. Jeffries*, here there is only information that grizzly bears "may be present" in the Forest, and only on a transient basis, and there is no information that grizzly bears "may be present" in the project area—the Fish Lake Trail area. Thus, the Forest Service was not required to take a "hard look" at the effects of allowing continued motorized use of Fish Lake Trail on any non-existent grizzly bears.

### b. Bull trout

Fish Lake contains the only natural bull trout population in the North Fork Clearwater River Basin. FOC contends that the Forest Service failed to take a "hard look" at the impacts on bull trout of allowing motorized use of Fish Lake Trail. Specifically, FOC contends that the 2017 ROD and 2011 FEIS lack any analysis specific to the Fish Lake bull trout population, the impacts of motorized recreation on Fish Lake Trail, or how allowing motorized recreation on Fish Lake Trail might exacerbate the threats to this specific bull trout population, including through illegal angler harvest and incidental hooking mortality—threats identified in the USFWS Biological Opinion.

However, as the Forest Service points out, it disclosed a detailed analysis of potential effects on bull trout in conjunction with its analysis of watershed and fisheries (AR 2762-80, 2744); and disclosed the bull trout population at Fish Lake (AR 2754; *see* AR 20855). The Forest Service also expressly considered and

incorporated the USFWS's Biological Opinion analysis of potential effects on bull trout, thereby providing notice to the public. (AR 73490, 3328-29.) This consideration and incorporation of the Biological Opinion into the 2017 ROD is consistent with and does not violate NEPA. *See* 40 C.F.R. § 1502.21 ("Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action.")[9]; 36 C.F.R. § 220.4(h) ("Material may be incorporated by reference into any environmental or decision document. This material must be reasonably available to the public and its contents briefly described").

The Court finds, based on the foregoing, that the Forest Service sufficiently analyzed and disclosed, and took a "hard look" at, the impacts and threats to the bull trout population in Fish Lake.

### c. Fisher

Finally, as to the fisher, the Forest Service disclosed that the Travel Plan "may impact individual fishers but would not likely contribute to a trend toward Federal listing or cause a loss of viability to the population or species"; and that

---

[9] As the parties point out, the Council of Environmental Quality regulations implementing NEPA were revised in 2020. The Court is therefore applying the version of the regulations in effect at the time the 2017 ROD was issued.

off-highway vehicle use in the 130,000 acres of suitable summer fisher habitat

could cause these potential effects. (AR 2831-32.) Although FOC argues that the

Forest Service should have included more site-specific information about the

Fisher, that argument was rejected in *FOC I* and is rejected again here. *See FOC I*,

2015 WL 119593, at *6 ("The record shows that the Forest Service examined the

relevant data and considered the environmental impacts of the proposed action

upon the area given the scope of the action, which comprises the overall impact of

the Travel Plan on the CNF as a whole. The scope of the Forest Service's analysis

is appropriately forest-wide.").

### 3.  Supplementation of the FEIS was not required.

In December 2020, the USFWS updated their map of the area where grizzly

bears may be present. (AR 73559.) This map indicates that grizzly bears may be

present in some areas of the Forest (*id.*) but does not indicate that grizzly bears

may be present in the Fish Lake Trail area. (AR 73569.) The USFWS explained

that "the description of grizzly bears as 'may be present' for project planning

purposes does not mean those locations are considered 'occupied range' (areas in

which grizzly bears have established home ranges and continuously reside). Nor

does  a 'may be present' designation equate to effects determinations of may affect

or likely to adversely affect." (AR 73566.) Further, "[t]he intent of the 'may be

present' map is to identify locations where project proponents should consider

whether grizzly bears 'may be present' when evaluating the potential impacts of a project." (AR 73560)

In response to this updated information regarding grizzly bears, the Forest Service drafted a document, which it calls the "Grizzly Bear Addendum," in which the updated information regarding grizzly bear presence is discussed. (AR 73567-68.) The Forest Service concluded that the updated information did not reveal effects on grizzly bears that had not been previously considered because the project area is not occupied by a breeding population of grizzly bears. Instead, the sightings in the Forest were of two males "that had dispersed from habitat approximately 100 air miles from the Forest, and there have been no further reports of these bears on the Forest, affirm[ing] that these are not resident individuals." (AR 73568.) The Forest Service thus determined that supplementation of the 2011 FEIS was not required. (AR 73567-68.)

FOC challenges this failure to supplement the 2011 FEIS, arguing that the Forest Service had a duty to supplement in light of this new information confirming the presence of grizzly bears on the Forest. The Court disagrees. The Forest Service's determination that the reported presence of the two male bears was transient in nature, and that there were no resident grizzly bears in the Forest, is fully supported by the record, and its determination that this new information

was not significant and did not require supplementation is both well-reasoned and supported by the record.

## ORDER

IT IS ORDERED that Plaintiff's Motion for Summary Judgment (Dkt. 25) is GRANTED in part and DENIED, and Defendants' Cross-Motion for Summary Judgment (Dkt. 29) is GRANTED in part and DENIED in part as follows:

1.    Summary judgment is GRANTED in favor of Plaintiff on the National Forest Management Act claims.

2.    Summary judgment is GRANTED in favor of Plaintiff on the Travel Management Rule claims.

3.    Summary judgment is GRANTED in favor of Defendants on the National Environmental Policy Act claims.

DATED: March 12, 2022

B. Lynn Winmill
U.S. District Court Judge